## State of Connecticut *v.* Ronald A. Leroux
### (6242)

Borden, Daly and O'Connell, Js.

Argued October 12, 1988—decision released April 25, 1989

*Mitchell S. Brody,* deputy assistant state's attorney, with whom, on the brief, was *Corrine L. Klatt,* deputy assistant state's attorney, for the appellant (state).

*Christopher W. Bromson,* with whom were *Wesley W. Horton* and *Donald G. Leis, Jr.,* for the appellee (defendant).

BORDEN, J. The decisive issue in this appeal involves the scope of the constitutional duty of the state to preserve evidentiary material that, had it been subjected to certain tests, might have exonerated the defendant. The state appeals from the dismissal of the information charging the defendant with manslaughter in the second degree with a motor vehicle, in violation of General Statutes § 53a-56b. The state claims that the trial court erred in dismissing the information. We find error.

Certain facts are not in dispute. On September 24, 1985, a tractor trailer occupied by the defendant and Jeffrey White ran off the westbound lanes of Interstate 84 in Waterbury. The truck rolled onto its right side, skidded along the pavement and came to an abrupt halt. Both the defendant and White were thrown through the windshield, which was driven out of its frame and onto the ground. White subsequently died from his injuries.

The initial police investigation of the scene of the accident failed to determine whether White or the defendant had been driving. State Police Trooper Lee Osborne returned to the scene approximately one month after the accident and recovered the shattered windshield of the truck. In early November, the windshield was sent to the state police forensic laboratory to determine whether there was hair or blood on it.

In early February, 1986, before the forensic laboratory had completed its examination of the windshield, the defendant's attorneys informed the state police by letter that they had retained an accident reconstruction expert and wished to discuss the available evidence.

Later that month, the forensic laboratory returned the windshield to Osborne along with a report that indicated that no blood or hair was found. Osborne concluded that the windshield had no evidentiary value, and destroyed it at the end of March, 1986.

On April 8, 1986, the defendant was charged with manslaughter in the second degree with a motor vehicle, in violation of General Statutes § 53a-56b. Thereafter, the defendant moved to require the state to disclose and produce, inter alia, "all exculpatory information and materials," and to compel the preservation of, inter alia, "any and all tangible objects which may at any time have been sent to the State Police Forensic laboratory for analysis . . . ."

On the basis of the destruction of the windshield, the defendant moved to dismiss the information. The trial court found that there were no eyewitnesses to the accident to establish who was the driver, and that the driver's identity would have to be established by reconstruction of the accident through physical evidence. The court also found, based on the testimony of the defendant's accident reconstruction expert, that the windshield was essential to determine the trajectories of the bodies as they were thrown from the truck. It further found that there was no comparable evidence to establish the trajectories, and that it should have been obvious to the police that the windshield was of great importance and should have been preserved. The court concluded that the destruction of the windshield deprived the defendant of evidence critical to his defense, and dismissed the information with prejudice. This appeal, filed with permission of the court, followed.

The state's principal claim is that the trial court erred in ruling that the destruction of the windshield violated the defendant's right to present a defense, as guaran-

teed by the due process clause of the federal constitution. U.S. Const., amend. XIV. We agree.

We recently explored the contours of the state's duty, under the federal constitution, to preserve potentially exculpatory evidence. See *State* v. *Scott,* 16 Conn. App. 172, 178–81, 547 A.2d 77 (1988). In *Scott,* we examined the then most recent pronouncement of the United States Supreme Court; *California* v. *Trombetta,* 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984); and concluded that *Trombetta* delineated two inquiries for discerning whether the state's destruction of evidence had violated a defendant's right to present a defense. The first inquiry was whether the police were acting in good faith, and the second inquiry was whether the evidence was material—whether its exculpatory value was apparent before its destruction and whether comparable evidence was reasonably available. *State* v. *Scott,* supra, 178. It was not clear from *Trombetta,* however, precisely what the relationship was between the bad faith standard and the materiality standard.

That relationship has now been clarified by the Supreme Court in *Arizona* v. *Youngblood,* 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).[1] The court

[1] *Arizona* v. *Youngblood,* 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), was released after the present case was argued in this court. The defendant brings to our attention the fact that our Supreme Court has continued to employ a standard derived from federal cases that predate even *Youngblood's* predecessor, *California* v. *Trombetta,* 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984), to decide cases involving the loss or destruction of evidence by the state. See, e.g., *State* v. *McIver,* 201 Conn. 559, 518 A.2d 1368 (1986). We are required to follow *Youngblood,* however, in analyzing the defendant's claim under federal law. When " 'a state court confronts a question of federal constitutional law "it may not impose greater restrictions as a matter of *federal constitutional law* when [the United States Supreme] Court specifically refrains from imposing them." (Emphasis in original.) *Oregon* v. *Hass,* 420 U.S. 714, 719, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975).' *State* v. *Perez,* 10 Conn. App. 279, 287 n.6, 523 A.2d 508, cert. denied, 203 Conn. 810, 525 A.2d 524 (1987)." *State* v. *Coleman,* 14 Conn. App. 657, 679–80, 544 A.2d 209, cert. denied, 208 Conn. 815, 546 A.2d 283 (1988).

in *Youngblood* articulated several principles. First, although in cases involving prosecutorial *suppression* of exculpatory evidence; e.g., *Brady* v. *Maryland,* 373 U.S. 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); the good or bad faith of the state is irrelevant, "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona* v. *Youngblood,* supra, 337.

Second, what we in *Scott* characterized as a two-part test in *Trombetta* is in fact a singular test, namely, whether the police acted in bad faith "turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id., 336–37 n.1. Thus, *Youngblood* collapsed the bad faith and materiality inquiries into one. In doing so, moreover, it reemphasized *Trombetta's* focus on whether the exculpatory value of the evidence was apparent before its destruction. Id.

Third, the reasons for a difference in treatment between suppressed and lost or destroyed evidence are (1) to avoid the treacherous task of determining the import of unknown, often disputed materials, (2) the unwillingness to impose on the police an absolute duty to preserve all material that might be of conceivable evidentiary value in a particular prosecution, and (3) a belief that requiring a showing of bad faith "both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Id., 337. The *Youngblood* court "therefore [held] that unless a criminal defendant can show bad faith on the part of

the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id.[2]

Application of these principles to this case leads us to conclude that the destruction of the windshield did not violate the defendant's federal due process rights. The trial court found that "the windshield was . . . highly material and might well have been exculpatory," and that "[i]t certainly should have been obvious to the police that the windshield was of great importance and . . . should have been preserved." More important, the trial court did *not* find that the evidence of the windshield *was* exculpatory; the absence of such a finding makes it impossible even to conjecture that Osborne knew at the time he destroyed it that the windshield had any exculpatory value. *Youngblood* equates bad faith in this context with the intentional destruction of evidence *known* to be exculpatory. Thus, despite the dissent's argument to the contrary, there was no evidence from which the trial court could have found, as a matter of federal law, that the destruction was done in bad faith. The most that can be said of Osborne's conduct is that it was negligent.

Indeed, even the testimony of Edmund R. Sullivan, the defendant's accident reconstruction expert, discloses that any exculpatory value of the windshield could not have been apparent to the police before it was

---

[2] The dissent's emphasis on the fact that the defendant in *Youngblood* did not accuse the police of destroying evidence in bad faith fails to distinguish *Youngblood* from the present case. It is of no moment that the defendant in *Youngblood* urged the court to dismiss the charges against him on grounds other than bad faith, because the specific holding of *Youngblood* predicates the dismissal of charges due to the destruction of evidence on a showing of bad faith on the part of the police and specifically defines the meaning of bad faith in this context. We therefore disagree with the dissent's insistence that *Youngblood* is inapposite in the present case. That "bad faith is the gravamen of the defendant's argument"; infra, 237, *O'Connell, J.,* dissenting; makes *Youngblood,* if anything, more pertinent.

destroyed. On the basis of the evidentiary material that was available to him, Sullivan was able to form an opinion regarding the identity of the driver of the vehicle. The gist of his testimony regarding the windshield was that it would have been the most important piece of physical evidence, that it could have been subjected to forensic tests to disclose the patterns of glass breakage and other damage, that the results of those tests, when taken together with the locations of the defendant's and White's bodies, would have aided a trajectory analysis, and that "if the [windshield] had been preserved . . . [his] opinion probably would be better and it would have been easier to arrive at." It is apparent from this testimony that neither the police nor Sullivan could have apprehended the exculpatory value of the windshield, if any, from the information available when the windshield was destroyed. The windshield was simply "evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant." Id. This does not suffice for a finding of bad faith.

In support of the trial court's decision, the defendant argues that, even if the destruction of the windshield did not constitute a deprivation of his due process rights under the fourteenth amendment, it did constitute such a deprivation under article first, § 8, of the Connecticut constitution.[3] We disagree.

Our Supreme Court has repeatedly held that, as a general rule, "the due process clauses of both the United States and Connecticut constitutions have the same meaning and impose similar limitations." *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982);

_____

[3] Article first, § 8, of the Connecticut constitution provides in pertinent part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . . "

*Caldor's Inc.* v. *Bedding Barn, Inc.,* 177 Conn. 304, 314, 417 A.2d 343 (1977). On the sole occasion thus far that the court has ascribed to our due process clause an independent meaning that imposed a duty on law enforcement officials broader than that imposed by the federal constitution, it did so based specifically on "both the historical record and our due process tradition" regarding the right to and importance of counsel in a criminal case. *State* v. *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988) (police have duty to inform suspect in custody of efforts by counsel to render legal assistance).

The defendant argues that our Supreme Court has made a similar departure from federal case law on the issue of the duty of the police to preserve potentially exculpatory evidence. He points to a series of recent cases on the issue of lost or destroyed evidence that were decided by our Supreme Court, using a balancing test that differs from the test enunciated in the then controlling federal case, *California* v. *Trombetta,* supra. See *State* v. *Gonzalez,* 206 Conn. 213, 224–25, 537 A.2d 460 (1988); *State* v. *McIver,* 201 Conn. 559, 565, 518 A.2d 1368 (1986); *State* v. *Boucino,* 199 Conn. 207, 229, 506 A.2d 125 (1986). The standard used by our Supreme Court in those cases was derived from pre *Trombetta* federal case law, and the defendant urges us to employ it under our own due process clause.

We need not decide in this case whether, under the due process clause of article first, § 8, the proper test is the same as that articulated under the federal constitution, or whether it is the balancing test stated in *Gonzalez, McIver* and *Boucino.* We conclude that, even under the test urged on us by the defendant, his claim fails.

" ' "In considering whether testimony concerning lost or destroyed evidence should be admitted [or the

underlying prosecution dismissed], the trial court has to look to numerous factors including [1] the reason for the unavailability of the evidence, [2] the materiality of the evidence, [3] the likelihood of mistaken interpretation of it by witnesses or the jury, and [4] the prejudice to the defendant caused by the unavailability of the evidence." *State* v. *Hamele,* 188 Conn. 372, 381, 449 A.2d 1020 (1982).' *State* v. *Boucino,* [supra, 229]." *State* v. *Gonzalez,* supra; see also *State* v. *McIver,* supra.

With regard to the first factor, namely, the reason for the unavailability of the evidence, our cases have focused on the motives behind the destruction of the evidence.[4] See, e.g., *State* v. *Gonzalez,* supra (although destruction of evidence was negligent, no evidence of deliberate and intentional destruction); *State* v. *McIver,* supra (no bad faith or malice); *State* v. *Boucino,* supra (no intentional destruction); *State* v. *Hamele,* supra, 382 (no bad faith or malice); see also *State* v. *Williamson,* 14 Conn. App. 108, 117, 552 A.2d 815 (bad faith demonstrated by reckless disregard for defendant's rights), cert. granted, 209 Conn. 801, 548 A.2d 442 (1988);

[4] We disagree with the dissent's contention that *Hamele, Boucino, Gonzalez* and *McIver* do not control the present case because those cases were couched in the factual context of negligent or accidental destruction of evidence, as opposed to intentional destruction. The first factor considered in *Hamele* and its progeny is "the reason for the unavailability of the evidence." *State* v. *Hamele,* 188 Conn. 372, 381, 449 A.2d 1020 (1982).

In *Hamele* itself, the physical evidence "was destroyed by the . . . police because of the mistaken belief that the charges against the defendant were no longer pending." Id., 372. Thus, the destruction of that evidence was intentional, albeit under a mistaken belief regarding its relevance. Similarly, in *McIver* the police, knowing that the victim's coat contained blood stains, returned it to her, thus permitting the subsequent elimination of the stains by cleaning. *State* v. *McIver,* 201 Conn. 559, 564, 518 A.2d 1368 (1986). This was the functional equivalent, at least, of an intentional but negligent destruction of the evidence by the police. Those cases, therefore, do apply to this case, where the destruction of the windshield was intentional—in the sense that Osborne intended to destroy it—but where that act was negligent in the sense that, under all the circumstances, it was unreasonable for him to do so.

*Snyder* v. *Reshenk,* 131 Conn. 252, 257, 38 A.2d 803 (1944) (good faith defined as honesty of purpose, lack of intent to defraud, and honest intent to refrain from taking unconscientious advantage of another). Although the record demonstrates negligence by Osborne, as the trial court found in effect, there was no evidence to suggest that he destroyed the windshield in order to help the state's case or to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights.

In this connection, we emphasize that when the windshield was destroyed, the case was still in the investigatory stage. The reasoning of Justice Stevens, concurring in *Arizona* v. *Youngblood,* supra, 59, is particularly apt. At the time the police destroyed the windshield, and "thus negligently lost potentially valuable evidence, they had at least as great an interest in preserving the evidence as did the person later accused of the crime. Indeed, at that time it was more likely that the evidence would have been useful to the police—who were still conducting an investigation—and to the prosecutor—who would later bear the burden of establishing guilt beyond a reasonable doubt—than to the defendant. In cases such as this, even without a prophylactic sanction such as dismissal of the indictment, the State has a strong incentive to preserve the evidence." At the least, therefore, courts should be very cautious in dismissing a case where no more than police negligence led to the loss or destruction of evidence during the investigatory phase, because as a matter of policy there is slight need for such a severe sanction.

The second factor, namely, the materiality of the evidence,[5] bears strongly in favor of the defendant. Based

---

[5] For purposes of this discussion, "materiality" has a broader meaning than the term as used in *Arizona* v. *Youngblood,* 488 U.S. 51, 62 n.1, 109 S. Ct.

on the testimony of Sullivan, which the trial court credited, the windshield would have yielded significant and relevant evidence regarding the identity of the driver.

With regard to the third factor, the trial court's pretrial dismissal of the information has deprived us of a full record on which to assess the likelihood of mistaken interpretation by the jury. That assessment can best be made in the context of all the evidence in the case and the court's instructions. In this connection, however, we note that the likelihood of such a mistake can be minimized at the trial by permitting testimony on the issue; see *State* v. *Gonzalez,* supra, 225; and by an appropriate instruction from the court permitting the jury to draw an adverse inference against the state. See id., 225 n.7; *State* v. *Hamele,* supra, 382 n.5.

With regard to the fourth factor, namely, the prejudice to the defendant, we recognize that, on the basis of Sullivan's testimony, the court found that the windshield was essential to determine the bodies' trajectories and that there was no comparable evidence to establish those trajectories. We conclude, however, that these findings are clearly erroneous.

First, Sullivan's affidavit is squarely at odds with these findings. In the affidavit, which was in evidence at the hearing on the motion to dismiss, he stated that he had reviewed all the available police reports and measurements, and the medical and autopsy reports of the defendant and White. He further stated: "Based on my experience and my reconstruction investigation, I can state with reasonable certainty that Jeffrey White

333, 102 L. Ed. 2d 281 (1988) ("materiality" refers to evidence whose exculpatory value is apparent without necessity of further testing). In our cases, the inquiry into the materiality of a piece of lost evidence has focused on whether that evidence was relevant and important to the defense. See, e.g., *State* v. *McIver,* 201 Conn. 559, 565, 518 A.2d 1368 (1986).

was the driver of the tractor trailer and that Ronald Leroux was a passenger." This opinion was based on his finding that White's injuries were consistent with his being the driver, and on his finding that "[t]he location at which Jeffrey White's body was found is consistent with the trajectory his body would have had after being ejected through the driver's windshield and being catapulted over the guard rail." Sullivan's opinion was based further on the defendant's medical records, "which clearly indicate that the injuries sustained to his left leg were caused by his being in the passenger seat and then being propelled through the passenger's window and becoming entangled in the wreck of the motor vehicle and then propelled down the highway." Thus, Sullivan was able, without the windshield, to arrive at an opinion regarding the trajectories of the bodies based on all the other available physical evidence.

Second, Sullivan's testimony fails to support the court's critical factual findings. Although, as he testified, the tests on the windshield would have aided his trajectory analysis and made his task much easier, that is an insufficient basis in this case for findings that the windshield was essential to that analysis and that there was no comparable evidence. The most that can be said is that, *if* the results of the tests had matched Sullivan's expectation, they would have bolstered the opinion he formed on the basis of the remainder of the physical evidence.

Indeed, it is possible that the negligent destruction of the windshield by Osborne, the state's reconstruction expert, will yield a greater benefit to the defendant than the preservation and testing of the windshield would have. The defendant will be able to impeach Osborne on his destruction of the windshield, thus damaging the credibility of his opinion testimony on the rest of the reconstruction evidence, whereas it is

pure speculation whether further testing of the windshield would have yielded exculpatory evidence.

Weighing in the balance the four factors articulated by *Gonzalez, McIver* and *Boucino,* we conclude that the defendant was not deprived of his constitutional right to present a defense by the destruction of the windshield. Although the evidence potentially yielded by the tests on the windshield would have been material, the reason for that destruction, the availability of adequate trial mechanisms to minimize the likelihood of mistaken interpretation of the destroyed evidence, and the absence of a significant showing of prejudice to the defendant, did not justify the dismissal of the information.

There is error, the judgment is set aside and the case is remanded with direction to deny the motion to dismiss and for further proceedings according to law.

In this opinion DALY, J., concurred.

O'CONNELL, J., dissenting. I do not agree with the conclusion of the majority which is based upon a line of cases arising out of negligent loss or destruction of evidence by the police. Negligent destruction is not the issue in this case. Here, the defendant argues that critical evidence was intentionally destroyed by the police acting in bad faith and that this police action prejudiced his defense. I agree that the evidence presented showed either bad faith, as argued, or such reckless disregard of the defendant's rights as to be the equivalent of bad faith. *State* v. *Williamson,* 14 Conn. App. 108, 117, 540 A.2d 386, cert. granted, 209 Conn. 801, 548 A.2d 442 (1988).[1]

It is firmly established in Connecticut law that the difference between intentional misconduct and reckless misconduct is microscopic and that one may be

[1] The Supreme Court's certification was limited to grounds that do not implicate the concept of equating recklessness with bad faith.

treated as the equivalent of the other. *Kowal* v. *Hofher,* 181 Conn. 355, 361–62, 436 A.2d 1 (1980); *Menzie* v. *Kalmonowitz,* 107 Conn. 197, 199, 139 A.2d 698 (1928). This principle was recently recognized by this court in *Futterleib* v. *Mr. Happy's, Inc.,* 16 Conn. App. 497, 509–10, 548 A.2d 728 (1988).

On appeal, this court can disturb the trial court's decision only if, after scrutiny of the entire record, it is determined to be clearly erroneous. *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.,* 207 Conn. 468, 473, 542 A.2d 692 (1988). In the present case, there was ample evidence to support the trial court's dismissal. There was evidence before it that long before the windshield's destruction, defense counsel wrote to the trooper, his commanding officer and the commissioner of state police explaining that an accident reconstruction expert had been retained by the defense and requesting that this expert be afforded an opportunity to examine all evidence that had been seized from the accident scene. The trooper acknowledged receipt of the letter and admitted participating in numerous conferences with defense counsel at the Waterbury state's attorney's office. In addition, the defendant's reconstruction expert conferred with the trooper as early as October, 1985, five months prior to the destruction.

The trooper in question was not in charge of the evidence room at his troop headquarters, nor were standard state police procedures for registration, storage and eventual destruction of evidence followed. The trial court had evidence before it from a state police sergeant that an "H.Q. Special Order" required that all seized evidence be kept until time of trial and that no evidence could be destroyed until a "destruct" notice had been issued by the court. See *California* v. *Trombetta,* 467 U.S. 479, 488, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984), on the significance of following established police procedures.

The trial court could logically conclude that the trooper's testimony, that he threw the windshield into a dumpster to protect others from being hurt on the broken glass, was entitled to scant, if any, credence. Access to the troop's evidence room was restricted to the property sergeant and the troop commander, thereby limiting to two the number of people who might be endangered by the windshield. Moreover, there was evidence before the trial court that there are procedures in everyday use by which potentially dangerous evidence of this type can be safely preserved for trial without constituting a hazard to anyone. Furthermore, there was no evidence that this trooper had been specially assigned to canvass the barracks for potentially dangerous evidence that might constitute a hazard.

The majority opinion relies heavily on *Arizona* v. *Youngblood,* 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). *Youngblood* was a sexual assault case in which the claimed misconduct was the failure of the police to refrigerate the victim's clothing, thereby depriving the defendant of the opportunity to perform certain tests for semen that would have been available otherwise. The United States Supreme Court concluded that "[t]he failure of the police to refrigerate the clothing and to perform the tests on the semen samples [could] at worst be described as negligent." Id., 58. Furthermore, the court explicitly agreed with the Arizona Court of Appeals, "that there was no suggestion of bad faith on the part of the police." Id. Here, by contrast, bad faith is the gravamen of the defendant's argument and "the line between 'good faith' and 'bad faith' is anything but bright . . . ." Id., 66 (Blackman, J., dissenting). Where the line blurs, as it frequently will in this type of case, the defendant is entitled to the benefit of any uncertainty.

I cannot agree that the bad faith or reckless destruction of the windshield in this case is comparable to the

negligent acts which occurred in the cases relied upon by the majority. The loss of a cat whisker from a baseball cap, cigarette butts and a glove; *State* v. *Boucino,* 199 Conn. 207, 228–29, 506 A.2d 125 (1986); the loss of one of two human hairs in the state toxicological laboratory; *State* v. *Harden,* 175 Conn. 315, 325–26, 398 A.2d 1169 (1978); the destruction of hairs after nolle of the case in the Circuit Court, where the police erroneously believed that the case was over and did not know that a bench warrant had kept the case alive in the Superior Court; *State* v. *Hamele,* 188 Conn. 372, 380–83, 449 A.2d 1020 (1982); the return of a coat to a victim who dry cleaned it, thus destroying an opportunity to examine menstrual bloodstains thereon, where the issue was consensual sexual activity; *State* v. *McIver,* 201 Conn. 559, 564–66, 518 A.2d 1368 (1986); the disappearance of the victim's bloodstained clothing which was never seen again after its return from toxicological laboratory. *State* v. *Gonzalez,* 206 Conn. 213, 224–25, 537 A.2d 460 (1988). These cases invoke carelessness or, at most, negligence, and are not precedent for intentional misconduct or recklessness of the magnitude involved in the present case.

Lack of comparable evidence is essential to the defendant's argument. The trial court found that there was no comparable evidence to an examination of the windshield. There was conflicting evidence on this issue. I would adhere to the fundamental rule that determination of the credibility of evidence is within the sole province of the trier of the fact. *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.,* supra; *Kaplan* v. *Kaplan,* 186 Conn. 387, 391, 441 A.2d 629 (1982). The conclusion of the trial court on lack of comparable evidence should be accepted.

The trial court expressly found, in both its oral decision from the bench and its later written articulation, that the windshield was highly material and bore sig-

nificant importance to the case. It stated, "[t]here were not [sic] eyewitnesses to establish who was the driver and who was the passenger. If this were to be established it would have to be done by recreation of the accident through physical evidence. *There was uncontroverted evidence by an expert for the defendant, which I find to be factually correct, that the windshield was essential in determining the trajectory of the bodies as they were catapulted from the cab. There was absolutely no indication of comparable evidence being available to establish such trajectories.* Clearly the destruction deprived the defendant of evidence critical to the defense. It certainly should have been obvious to the police that the windshield was of great importance and it should have been preserved." (Emphasis added.)

The trooper in question possessed qualifications beyond that of an ordinary police officer. He testified concerning specified training in accident reconstruction and was offered by the state as an accident reconstruction expert.

Furthermore, in determining that the defendant had demonstrated prejudice in his ability to present a defense, the court stated in its oral decision: "I think that, in a hearing of this sort, it is incumbent on the state to rebut that showing of prejudice. And, whether the burden on the state is a fair preponderance of the evidence, clear and convincing evidence or beyond a reasonable doubt, it doesn't make any difference because I don't think the state has met any one of those three standards, as far as rebutting is concerned."

*Youngblood* and the majority in this case both rely on the fact that the destruction took place while the matter was still in the *investigatory stage*. While it is true that a warrant had not yet been issued, the investigation had already focused on the defendant as the only possible suspect. He was represented by counsel,

a letter concerning evidence had been written to the police, conferences had taken place at the state's attorney's office and a defense reconstruction expert had been retained and had conferred with the investigating trooper. In addition, the accident at issue took place on September 24, 1985. The windshield was destroyed in late March, 1986, and the warrant was issued on April 8, 1986. Because the defendant's identity was known from the beginning of the case, it impresses me as an odd coincidence that the windshield was destroyed so shortly before the warrant was issued. The close proximity of the date of destruction to the date of the warrant leads me to the conclusion that the *investigatory stage* was over prior to the destruction.

It is not disputed that the trooper personally and unilaterally decided that the windshield had no evidentiary value and should be destroyed. I cannot concur in a decision which leads to a delegation to the police of a determination of what seized property has evidentiary value. This decision belongs, in the first instance, to the attorneys and eventually to the court. The present case is a prime example of the danger of the delegation of this authority to the police. Here, an experienced trial court judge disagreed with the decision of the destroying officer, but alas, it was then too late to recover the destroyed evidence.

I cannot agree with the majority that the windshield was destroyed through simple negligence. It was either intentionally destroyed in order to deprive the defendant of its use or its destruction was the result of recklessness. Either reason is the equivalent of intentional misconduct and produces the same result; the deprivation of its use, to the material prejudice of the defendant.

I would affirm the trial court's dismissal of the case. Therefore, I respectfully dissent from the majority opinion.